UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

DETROIT INTERNATIONAL
BRIDGE COMPANY, LLC, a Michigan
Limited Liability Company,

        Plaintiff,

v.

STRUCTURAL TECHNOLOGIES,
LLC, a Maryland Limited Liability
Company,

        Defendant.

Case No.

## COMPLAINT

NOW COMES Plaintiff, Detroit International Bridge Company, LLC ("DIBC"), a Michigan Limited Liability Company, by and through its counsel, and hereby states as follows:

### Parties Jurisdiction and Venue

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

2. DIBC is a Michigan limited liability company conducting business in Wayne County, Michigan.

1

3. The sole member of DIBC is a Michigan LLC with its principal place of business in Michigan. The sole member of that Michigan LLC is an Indiana LLC with its principal place of business in Michigan. That Indiana LLC is owned by two trusts created under Michigan law and have their principal place of business in Michigan. The trustee of both of these trusts is a Michigan citizen.

4. Upon information and belief, Defendant Structural Technologies, LLC ("ST") is a Maryland limited liability company, with its registered and principal office of business located at 10150 Old Columbia Road Columbia, MD 21046-1274.

5. Upon information and belief, ST is composed of one member, Structural Technologies Holdings, LLC ("STH"), a Maryland limited liability company, with its registered and principal office of business located at 10150 Old Columbia Road Columbia, MD 21046-1274

6. Upon information and belief, the members of STH are not domiciled in Michigan or Indiana.

## General Allegations

A. Project Background and ST's Investigation and Representations to DIBC

7. DIBC is the owner of the Ambassador Bridge (the "Bridge").

8. A substantial project developed that involved, *inter alia*, certain bridge repairs, including DIBC's desire to remove and replace steel cables and hangers on 196 different panel points on the Bridge ("the Project").

9. One of the companies who expressed an interest in performing the work on the Project was ST.

10. In its promotional materials provided to DIBC, ST described the Bridge as and identified various structural elements that would, in part, involve the proposed scope of work for ST.

11. In an effort to gain the work, ST made numerous representations about its skill and ability to successfully and timely complete the Project. For example, that "Structural Technologies-VSL (ST-VSL) will serve as a general contractor, working in conjunction with the Detroit International Bridge Company (DIBC, Owner) and the Canadian Transit Company." Additional representations from ST included that it was a "worldwide leader in the field of cable supported bridge systems and related engineering and services".

12. ST also represented that:

> "Post-tensioning is ST-VSL's core business, and the post-tensioning principle is also applicable to stay cables, suspenders, and external tendons. ST-VSL's understanding of prestressing has also led to the development of STVSL's heavy lifting technique which provides safe and cost-effective solutions for lifting and lowering large and heavy loads, similar to the suspender bypass system used on this project. With ST-VSL's field experience, we can provide technical support during the planning and construction phases of the project. Our comprehensive range of services includes feasibility studies, alternative proposals, detailing, project coordination, contractor consulting and general as well as specialty construction. These services aim to provide the best solution to the Owner's most

3

        challenging repair and restoration problems with the highest attention to safety and quality. ST-VSL also has the ability to perform work in a union or open shop environment depending on the project requirements. Since a large part of our work is out of town, ST-VSL's general approach to contracting is to staff the project with our senior field crew comprised of a superintendent and foremen. Additional forces to supplement our crews are either hired locally to the project and/or from our local office. The ratio of field leaders to technicians will vary depending on the project size and complexity of the work."

13. ST's continued representations state that ST has "extensive experience in performing repair and rehabilitation for a wide variety of bridge and transportation-related structures." In addition, ST represented to DIBC in its promotional materials to have fully understood the unique characteristics of the Bridge and the scope of services that would be required of ST in performing the work on the Project.

14. Apart from representing its expertise, ST made other material representations regarding its team members who were already in place and would be working on the Project:

        "A time frame of a typical ST-VSL project ranges from a period of a few days to a few years; therefore, this team commonly has availability in the near-term, such as for this project. **Team members have been selected based on their technical capabilities and availability to complete the work on schedule. The project team members chosen for this project do not have obligations that would prevent them completing this project prior to the 2023 deadline**. Our team members are capable of

        working flexible hours over extended periods to limit the impact of rehabilitation work on the motoring public or to complete a project within a shorter time frame and re-open the bridge. The proposed project team is prepared to meet the project-specific deadlines without adversely affecting any of our current commitments." (emphasis added)."

15. ST also represented that the following:

        **"We are enthusiastic about this technically challenging project** and believe we have assembled the most qualified team to successfully achieve the project objectives. ST-VSL will serve as a general contractor to the Detroit International Bridge Company for this project. ST-VSL is a leader in the field of cable supported structures and related services. ST-VSL has compiled a team with extensive experience including main cable repair, suspender rope replacement, suspender adjustments, and modifications to anchors... ST-VSL brings more than 30 years of bridge repair and retrofit experience to this project. Over this time, **ST-VSL has built a strong, dedicated team of project managers, engineers, detailers, and field specialists.** As a part of Structural Group (STRUCTURAL), the nation's largest repair contractor, ST-VSL has the capability to combine specialty contracting, in-house engineering, value-added products and engineering support to provide customized solutions carried out with a priority on **safety** for our clients." (emphasis in original)."

16. In essence, ST provided DIBC with information and/or representations that ST: (a) had investigated the Project, (b) understood the needs of the Project; (c) would properly staff the Project; and (d) finish the Project in 2023, all with the specific intention for DIBC act and rely upon.

5

B. The DIBC-ST Contract

17. On May 23, 2022, ST (also referred to as "VSL"), submitted a proposal to DIBC to "remove existing and install replacement the cable hangers (196) for the reference project subject to the terms and conditions herein." (*See* VSL Proposal No. 615398, copy attached as **Exhibit A**).

18. The price and scope of the Proposal in Exhibit A were the following:

| item No. | Description | UOM | Quantity | Unit Price | Extended Price |
|---|---|---|---|---|---|
| 1 | Mobilization | LS | 1 | $450,000 | $450,000 |
| 2 | 3 7/8" Shims stacks for 98 hangers (196 terminations) | EA | 196 | $639.48 | $125,339 |
| 3 | Hanger Replacement (196) | EA | 196 | $22,454 | $4,401,047 |
| | | | | Total | $4,976,385 |

Price(s): (Taxes excluded)

*Id*.

19. In addition, the Proposal specifically provides that Defendant's work would be completed by December 1, 2023.

20. The next day, on May 24, DIBC issued Purchase Order PO00112799 to ST (the "PO").

21. The PO contained a "not to exceed" contract price for ST in the amount of $4,976,385.00.

22. The PO included a completion date of November 2023 (*See* Purchase Order, copy attached as **Exhibit B**).

6

23. The work identified in the Purchase Order was for ST to "[s]upply and install Suspender Rope Replacement for the Bridge Project". *Id.*

24. ST accepted the PO and promptly commenced performance upon its receipt of the PO from DIBC.

25. ST immediately began invoicing DIBC for work performed on the Project through November 28, 2023, all of which DIBC paid in full:

| Purchase Order Number: | 112799 | $ 4,976,385.00 | | |
|---|---|---|---|---|
| INVOICE NUMBER | INVOICE DATE | INVOICE AMOUNT | Sales Tax | BALANCE OWING |
| | | | | 4,976,385.00 |
| 112799-1 | 3-Jun-22 | $112,500.00 | | 4,863,885.00 |
| 112799-2 | 30-Sep-22 | 337,500.00 | | 4,526,385.00 |
| 112799-3 | 30-Mar-23 | 170,246.72 | | 4,356,138.28 |
| 112799-4 | 23-May-23 | 269,451.85 | | 4,086,686.43 |
| 112799-5 | 15-Jun-23 | 404,177.78 | | 3,682,508.65 |
| 112799-6 | 14-Jul-23 | 404,177.78 | | 3,278,330.87 |
| 112799-7 | 15-Aug-23 | 246,997.53 | | 3,031,333.34 |
| 112799-8 | 9/15/2023 | 134,725.93 | | 2,896,607.41 |
| 112799-9 | 10/17/2023 | 134,725.92 | | 2,761,881.49 |
| 112799-10 | 11/28/2023 | 106,013.93 | | 2,655,867.56 |
| Total to Date: | | $2,320,517.44 | | |

C. *ST's Delayed Performance*

26. Despite its contractual promise that ST would complete the Project by November 2023, ST had only performed approximately 40% of its work by the required completion date.

27. Then, on January 18, 2024, ST wrote to DIBC for the first time to request additional compensation beyond the "not to exceed" price by stating that:

7

"The purpose of this letter is to update the team with the remaining schedule at the current labor and equipment configuration as well as address the cost overages we have seen to date. We would like to discuss additional compensation for these overages and are currently compiling the totals. As of our demobilization in November 2023, 117 of the 198 hanger cables are left to be replaced. With the current crew and equipment configuration, we anticipate replacing 2 hanger cables every week. This is based on a six day work week and computes to 13.5 months. Given one month of float to accommodate holidays and downtime, the total comes to 14.5 months (April-Mid November 2024 and April-Late October 2025).

Per your request, our current crew configuration to achieve this schedule is one Structural Technologies Superintendent, one Structural Technologies Foreman, four ironworkers (three EA AC Metals and one EA Local 25) and one crane operator. The amount of equipment considered for this schedule is two jacking beams, one crane, one manlift, two spider platforms, one scheme C beam, two hanger cable clamps, four lower platforms and related softeners/rollovers/pin hangers/uncoilers/etc. for working two panel points. Please note that the following items were added to expedite the work to date and going forward; Structural Technologies Foreman, second jacking beam, second cable clamp assembly, and the third/fourth lower platforms. We request additional compensation for these added items as well as extended duration items related to the added schedule going forward.

We also have incurred and will incur additional labor costs that were not included in our proposal nor anticipated during bid time. As a result of the labor shortage in the area, we subcontracted AC Metals at your recommendation to progress the project. The hourly rate not only came at a premium, but we also have been working substantial overtime to not only progress the

8

> work, but also to keep the crew from going to other projects. Please note that overtime and this premium were not included in our contract and we would like to discuss compensation for this."

(*See* January 18, 2024, ST Correspondence, copy attached as **Exhibit C**).

28. ST failed to timely perform its work and admitted that it failed to obtain a sufficient workforce ahead of time to complete its work in a timely manner.

29. Despite its promotional materials to the contrary, ST did not have any "team" assembled to perform the work.

30. ST's demand for additional compensation was rejected by DIBC.

31. ST notified DIBC that its work on the Project would not be completed until October 25, 2025, almost a full 2 years later than ST's contractual promise, and only if DIBC paid significant additional money to ST that was never authorized.

32. On March 1, 2024, ST again wrote to DIBC, explaining to DIBC that ST made faulty assumptions on labor prior to accepting the PO (*See* March 1, 2024, ST Letter, copy attached as **Exhibit D**).

33. Specifically, ST stated as follows:

> Structural Technologies (STR hereafter) assumed labor would be locally available as needed by sourcing the local Union's labor pool. This was not the case due to local market conditions at the time of job startup and continues today. In order to get the project moving forward, STR entered into a contract with AC Metals to provide subcontracted labor per DIBC's recommendation. This Subcontract came at a premium due to the subcontractor's mark-up, insurance premiums, admin fees, HST tax and overtime. In order to secure this manpower onsite to staff the project, 55 hour work weeks were also instituted. Without doing so, staff would go to other projects already guaranteeing substantial overtime. This was also a result of the local labor shortage. The above added costs were not included in our project bid or contract with DIBC.

9

*Id* (emphasis added).

34. ST now sought additional costs of $3,422,343.37, including a staggering and outlandish profit and overhead request of $684,468.67 that was not earned. *Id*.

35. Based upon ST's failures to perform and breaches of contract, on March 19, 2024, DIBC issued a stop work order to ST (*See* Electronic Mail, copy attached as **Exhibit E**).

D. Post-Termination

36. ST continued its baseless demands for additional payment.

37. DIBC continued to deny ST and responded and outlined that:

> "DIBC is not responsible for ST's mistakes and poor decisions on how to manage its equipment and labor. DIBC has already paid ST in the amount of $2,320,517.33 for the value of the work that ST did complete per the terms of our contract, and the amount paid exceeds what you have earned. DIBC denies ST's request for compensation in its entirety. Further, and as you should expect, DIBC has suffered damages as a result of ST's failures under the contract, including your failure to timely complete the work. DIBC will continue to incur additional and compensable costs that ST will be held responsible to pay because of ST's breaches of contract. ST's failure to complete the work by November 2023 and failure to adhere to the "not to exceed" price are beyond dispute. DIBC has gone without the new hangers it should have had for over a year, and DIBC has had no choice but to now directly engage AC Metals as your replacement contractor to complete the work at added cost. The cost for the new contractor to complete the remaining work is at least $2,029,402.76 more than ST's contract price to

> replace the remaining 117 hangers. DIBC also intends to recover its consequential and special damages incurred. In addition, and as mentioned above, DIBC has overpaid ST based on a pro-rata price per hanger actually installed by ST of at least $314,729.61.
>
> In conclusion, DIBC denies any and all claims for additional payment or relief from ST. DIBC will gather its costs and damages incurred to date for presentment and payment by ST. We are fully prepared for legal action."

(*See* May 27, 2025, DIBC Correspondence to ST, copy attached as **Exhibit F**).

38. ST failed to perform its obligations under the PO, including but not limited to, ST's failure to properly staff the Project, sequence the work, and ultimate failure to timely deliver the Project within the "not to exceed" contract price established in the PO.

39. ST materially misrepresented its ability to the perform the work and breached its obligations under the PO.

40. DIBC is entitled to damages.

## COUNT I- BREACH OF CONTRACT

41. DIBC incorporates its previous allegations as if fully rewritten herein.

42. ST and DIBC entered into a contract when ST accepted and commenced performance upon receipt of the PO. See **Exhibit B** (Purchase Order).

43. ST began performance following the issuance of the PO.

44. ST materially breached its obligations under the PO by failing to timely deliver the Project on schedule and within the "not to exceed" contract price.

11

45. ST committed the first material breaches of contract.

46. As a direct and proximate result of the foregoing breaches of contract, DIBC has been damaged in an amount in excess of $75,000.00, plus interest, attorney's fees, and costs.

WHEREFORE, Plaintiff DIBC respectfully requests that this Honorable Court enter a judgment in its favor and against ST in an amount in excess of $75,000.00, plus attorney fees, costs, interest and such other relief as may be equitable and just.

### COUNT II- FRADULENT MISREPRESENTATION

47. DIBC incorporates its previous allegations as if fully rewritten herein.

48. ST made multiple material misrepresentations to DIBC including but not limited to the misrepresentations set forth in its Request for Purchase Order (**Exhibit A**) as it relates to: (a) the staffing of the Project; (b) ST's expertise and ability to complete the Project on time and on budget; (c) the means and methods of constructing the Project; (d) sequencing of construction; (e) sufficiency of labor needed to complete the Project by November 2023; and (f) its investigation into the Project needs.

49. ST's representations were material and false.

50. ST knew those representations were false or made its representations recklessly without knowledge of their truth.

51. DIBC properly and reasonably relied upon those representations.

52. Had DIBC known that ST's representations were false, DIBC would have never issued the PO to ST. As a direct and proximate cause of ST's misrepresentations, DIBC has suffered significant damages.

WHEREFORE, Plaintiff DIBC respectfully requests that this Honorable Court enter a judgment in its favor and against ST in an amount in excess of $75,000.00, plus attorney fees, costs, interest and such other relief as may be equitable and just.

## COUNT III- INNOCENT MISREPRESENTATION

53. DIBC incorporates its previous allegations as if fully rewritten herein.

54. ST made multiple material misrepresentations contained in Exhibit A as it relates to: (a) the staffing of the project; (b) ST's expertise; (c) the means and methods of constructing; (d) sequencing of construction; (e) sufficiency of labor needed to complete the Project by November 2023; and (f) its investigation into the Project needs.

55. ST's representations were false or made recklessly.

56. DIBC properly and reasonably relied upon those representations, and had DIBC known that these representations were false, it would have never issued a purchase order to ST. As a direct and proximate cause of ST's misrepresentations, DIBC has suffered significant damages.

WHEREFORE, Plaintiff DIBC respectfully requests that this Honorable Court enter a judgment in its favor and against ST in an amount in excess of $75,000.00, plus attorney fees, costs, interest and such other relief as may be equitable and just.

### COUNT IV- NEGLIGENT MISREPRESENTATION

57. DIBC incorporates its previous allegations as if fully rewritten herein.

58. ST made multiple material misrepresentations contained in Exhibit A as it relates to: (a) the staffing of the project; (b) ST's expertise; (c) the means and methods of constructing; (d) sequencing of construction; (e) sufficiency of labor needed to complete the Project by November 2023; and (f) its investigation into the Project needs.

59. ST had a duty to be truthful and accurate to provide accurate and correct information at all times.

60. ST's representations were false.

61. ST negligently made those representations and breached its duties to DIBC.

62. DIBC properly and reasonably relied upon those representations, and had DIBC known that these representations were false, it would have never issued a purchase order to ST. As a direct and proximate cause of ST's misrepresentations, DIBC has suffered significant damages.

WHEREFORE, Plaintiff DIBC respectfully requests that this Honorable Court enter a judgment in its favor and against ST in an amount in excess of $75,000.00, plus attorney fees, costs, interest and such other relief as may be equitable and just.

### COUNT V- FRAUD IN THE INDUCEMENT

63. DIBC incorporates its previous allegations as if fully rewritten herein.

64. ST made multiple material misrepresentations contained in Exhibit A as it relates to: (a) the staffing of the project; (b) ST's expertise; (c) the means and methods of constructing; (d) sequencing of construction; (e) sufficiency of labor needed to complete the Project by November 2023; and (f) its investigation into the Project needs.

65. These representations were false, and ST knew these representations were false or ST recklessly made such representations without regard for their truth.

66. These representations were intended such that DIBC would rely upon such representations and act upon said representations.

67. DIBC did rely upon such representations, and that such reliance was reasonable, and but for those representations, would have never issued a purchase order to ST.

68. As a direct and proximate cause of ST's misrepresentations, DIBC has suffered significant damages, and had DIBC known these representations were false, it would not have entered into any agreement with ST.

WHEREFORE, Plaintiff DIBC respectfully requests that this Honorable Court enter a judgment in its favor and against ST in an amount in excess of $75,000.00, plus attorney fees, costs, interest and such other relief as may be equitable and just.

Respectfully Submitted,

DENEWETH, VITTIGLIO & SASSAK, P.C.

Dated: June 19, 2025   By: */s/ Anthony Vittiglio II*
Anthony Vittiglio II (P66347)
Scott D. Stoner (P55653)
Jacob Kahn (P81817)
1175 W. Long Lake Rd., Ste. 202
Troy, MI 48098
(248) 290-0405
avittiglio@dvs-law.com
sstoner@dvs-law.com
jkahn@dvs-law.com

6169.2/25 0619 Complaint

16